UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| WESLEY WILLIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:16-cv-02053-TWP-DKL |
| ) | |
| COMMISSIONER OF THE INDIANA ) | |
| DEPARTMENT OF CORRECTION, in his official ) | |
| capacity, and SUPERINTENDENT OF THE ) | |
| PENDLETON CORRECTIONAL FACILITY, in ) | |
| his official capacity, ) | |
| ) | |
| Defendants. ) | |

## ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on the parties' cross motions for summary judgment. Plaintiff Wesley Willis ("Willis") filed this action challenging the constitutionality of a prison regulation. Willis claims that the Indiana Department of Correction ("IDOC") has wrongfully withheld a newspaper publication from him in violation of the First Amendment to the United States Constitution. Each party seeks resolution of the challenge through the entry of summary judgment. For the reasons explained in this Entry, Willis' Motion for Summary Judgment (Filing No. 26) is **denied** and the Defendants' Cross-Motion for Summary Judgment (Filing No. 31) is **granted**.

## I. FINDINGS OF FACT

The material facts are undisputed. Willis, an inmate in the custody of the IDOC is confined at the Pendleton Correctional Facility ("Pendleton"). Defendants, the Commissioner of the IDOC and the Superintendent of Pendleton, are state officials sued in their official capacities only.

Beginning in mid-2015, Willis subscribed, at an annual cost of $24.00, to the San Francisco

Bay View National Black Newspaper ("the Newspaper"). The Newspaper is an independent publication that attempts to cover issues and current events that are unlikely covered by other media outlets. The Newspaper primarily reports cutting-edge articles and commentary that frequently pertain to civil rights, incarceration, and institutional reform. It also covers subject matter on the economy, politics, the arts, education, history, current events, health, and religion—with a particular emphasis on material that it believes to be relevant to the African-American community. The Newspaper relies heavily on contributions from volunteers—both to contribute material and assist in the Newspaper's publication and distribution. Among the volunteers that regularly contribute content are inmates incarcerated throughout the United States, as well as former inmates.

For several years, the Newspaper has been allowed, without interruption, into facilities operated by the IDOC. In the past, Willis received copies of the Newspaper in accordance with IDOC policies governing prisoner correspondence. In fact, he received copies of the Newspaper from mid-2015 through November 2015, and is aware that other inmates have received the Newspaper for significantly longer periods of time. Beginning with the December 2015 edition of the Newspaper, however, Willis has been informed each month that IDOC personnel believe the Newspaper represents a threat to institutional security and they have therefore confiscated and refused to disseminate issues of the Newspaper to Willis, pursuant to IDOC's Inmate Correspondence Policy ("the Policy"). The Policy in question is Indiana Department of Correction Policy and Administrative Procedure No. 02-01-103. Filing No. 26-1 at 27-52.

Pendleton operates a central mail room that provides mail services to the entire prison. The mail room has a staff of three (3) full time and one (1) part time employees. The hours of operation are from 6:00 a.m. to 2:00 p.m., five days per week. Approximately 1,250 incoming pieces of

mail and 1,500 pieces of outgoing mail are processed by Pendleton's mail room each day of operation. This total includes correspondence, books, packages, legal mail, publications, and any other miscellaneous mail items. All correspondence sent to an offender is to be opened by a staff person in order to permit verification and recording of receipt of property; and inspection for, and removal of, contraband or prohibited property. IDOC policy also prescribes that incoming offender correspondence is to be held no more than 24 hours for letters and 48 hours for packages.

An inmate at Pendleton may not receive correspondence that is deemed by the IDOC to be "restricted correspondence." "Restricted correspondence" is mail that is authored by a person:

      A. held in a correctional facility (Federal, State, or local);
      B. on parole;
      C. sentenced to a community corrections program;
      D. held in a county jail;
      E. released from a Department correctional facility to county probation supervision;
      F. participating in a Community Transition Program (CTP); or
      G. participating in a work release program.

"Restricted correspondence" also includes any publication that contains material authored by a person who meets the foregoing Definition.

If Pendleton mail room employees believe that a piece of mail relates to a so-called "security threat group" then they will forward the mail to a "security threat group coordinator." The IDOC defines a "security threat group" ("STG") as "a group of offenders that sets themselves apart from others and pose[s] a threat to the safety and security of the staff or offenders and is disruptive to programs and the orderly management of the facility." Prison gangs, such as the Blood, the Crips, the White Aryan Brotherhood, and the New Black Panther Party, are STGs as defined under the Policy. Articles or other material in publications that the IDOC believes "promotes" or "glorifies" a STG are to be withheld. However, material that reports on such groups in an "objective" manner is permitted. Again, in all cases, the correspondence is withheld if it

3

poses an immediate danger to the safety of an individual or a serious threat to the security of the facility or program. More specifically, correspondence containing STG signs or symbols, articles about weapons, alcohol, and narcotics, and articles that promote violence, or any kind of organized demonstrations or strikes are all subject to being censored under the Policy.

If it is determined that a portion of the printed matter (book, correspondence, publication, etc.) is to be excluded from a facility, the entire printed matter is excluded. In this instance, the facility staff will contact the offender and request that the offender advise as to what arrangements are to be made concerning the disposition of the correspondence.

The Newspaper contains articles and commentary which Willis finds interesting, informative and highly relevant; accordingly, he purchased a subscription in mid-2015. In December 2015 the Newspaper published an editorial authored by an inmate, Shaka Shakur ("Shakur"), titled "Do Black lives matter behind prison walls?" ([Filing No. 26-4](#).) At the time when he penned the article, Shakur resided in the restricted status housing unit at Pendleton, however, by December 2015 he had been transferred to another IDOC facility. Within the IDOC, Shakur was determined to be a member of an STG. IDOC staff concluded that Shakur's article violated the restricted correspondence provision of the Policy, and they withheld distribution of the December issue of the Newspaper. Thereafter, every edition of the Newspaper has been withheld from inmates at Pendleton, including Willis. IDOC asserts that each of the withheld editions contains at least one instance of objectionable content.

The IDOC does not dispute that the Newspaper also contains non-objectionable materials. However, IDOC offers three justifications for refusing Willis access to the Newspaper: some of the material is authored by out-of-state or federal inmates; some of the material contains reference to STGs (or persons associated with those groups) or because it encourages participation in these

groups or otherwise promotes inmate revolt; and even the dissemination of non-objectionable portions of the Newspaper cannot be accomplished because the process of redaction would prove too taxing on institutions. ([Filing No. 27 at 1-2](Filing No. 27 at 1-2).)

Willis concedes that isolated material contained in the Newspaper may appropriately be withheld from inmates (including the article written by Shakur in the December 2015 Newspaper); however, he contends the IDOC has no penological justification for censoring the entire Newspaper and as such, this censorship violates his First Amendment Rights. He seeks an injunction requiring the IDOC to allow him to receive the previously withheld editions of the Newspaper and to continue receiving the Newspaper in the future.

## II. SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to pierce the pleadings to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 578, 587 (1986). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence which "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, a disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be

5

considered. *Anderson*, 477 U.S. at 248.

On summary judgment, a party must show the court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). The court cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them". *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

"The existence of cross-motions for summary judgment does not, however, imply that there are no genuine issues of material fact." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers*, 335 F.3d 643, 647 (7th Cir. 2003). Cross-motions for summary judgment are treated separately. *McKinney v. Cadleway Properties, Inc.,* 548 F.3d 496, 504 n. 4 (7th Cir. 2008). When cross-motions for summary judgment are filed, courts "look to the burden of proof that each party would bear on an issue of trial; [courts] then require that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Santaella v. Metropolitan Life Ins. Co.,* 123 F.3d 456, 461 (7th Cir. 1997) (citing *Celotex,* 477 U.S. at 324).

## III. CONCLUSIONS OF LAW

Willis' claim is asserted pursuant to 42 U.S.C. § 1983. "Section 1983 is not itself a source of substantive rights; instead it is a means for vindicating federal rights elsewhere conferred." *Ledford v. Sullivan,* 105 F.3d 354, 356 (7th Cir. 1997) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

"'[L]awful incarceration brings about the necessary withdrawal or limitation of many privileges or rights, a retraction justified by the considerations underlying our penal system.'" *Pell v. Procunier,* 417 U.S. 817, 822 (1974) (quoting *Price v. Johnston,* 334 U.S. 266, 285 (1948)). A prisoner "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with legitimate penological objectives of the correctional system." *Id*. Encompassed within the First Amendment is the right to receive and read written publications. *Thornburgh v. Abbott,* 490 U.S. 401, 413–14 (1989). "The Supreme Court has held that 'imprisonment does not automatically deprive a prisoner of certain important constitutional protections, including those of the First Amendment.'" *Jackson v. Frank*, 509 F.3d 389, 391 (7th Cir. 2007) (quoting *Beard v. Banks,* 548 U.S. 521 (2006)).

"A prison regulation that restricts an inmate's First Amendment rights is permissible if it is 'reasonably related to legitimate penological objectives.'" *Id.* (quoting *Turner v. Safely,* 482 U.S. 78, (1987)); *see also Thornburgh v. Abbott,* 490 U.S. 401 (1989).

In *Turner,* 482 U.S. at 85, the Supreme Court outlined a standard for determining whether a prison regulation violates an inmate's Constitutional rights. Under the *Turner* analysis, courts consider four factors to determine whether a challenged regulation is reasonably related to legitimate penological interests. *Id.* at 89. "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it."

7

*Id.* (quoting *Block v. Rutherford,* 468 U.S. 576, 586 (1984)). Second, courts consider "whether there are alternative means of exercising the [constitutional] right that remain open" to the inmate. *Id.* at 90. Third, courts evaluate the impact an accommodation of the constitutional right "will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* And fourth, courts determine whether ready alternatives exist to the challenged regulation. *Id.* When challenging the reasonableness of the prison's regulation, the inmate bears the burden of persuasion. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). The *Turner* factors "strike[ ] a balance between the policy of judicial restraint regarding prisoner complaints and the need to protect constitutional rights." 482 U.S. at 85. Additionally, prison officials are not required to prove that a restricted publication would actually cause a problem in the prison, and the application of the regulation may legitimately be based on a prison administrator's reasonable assessment of *potential* dangers. *See Prison Legal News v. Livingston,* 683 F.3d 201, 216 (5th Cir. 2012).

While the ultimate burden of persuasion as to the unreasonableness of a regulation or official action resides with the inmate, *Overton v. Bazzetta,* 539 U.S. 126, 132 (2003), prison officials must "put forward" the legitimate governmental interest alleged to justify the regulation, *Turner,* 482 U.S. at 89, and demonstrate the rational connection between the regulation or official action and the interest asserted, *Josselyn v. Dennehy,* 333 Fed. Appx. 581, 2009 WL 1587695, at *2 (1st Cir. June 9, 2009). Prison officials may or may not need evidence to demonstrate this connection; where, the connection is obvious, common sense can suffice. *See Cal. First Amend. Coal. v. Woodford,* 299 F.3d 868, 881 (9th Cir. 2002); *Wolf v. Ashcroft,* 297 F.3d 305, 308 (3d Cir. 2002); *Amatel v. Reno,* 156 F.3d 192, 196 (D.C.Cir. 1998); *cf. Quinn v. City of Boston,* 325 F.3d 18, 39 n.10 (1st Cir. 2003) (noting that rational basis review may be based on "rational speculation unsupported by evidence or empirical data'") (quoting *Fed. Commc'ns Comm'n v. Beach*

*Commc'ns, Inc.,* 508 U.S. 307, 315 (1993)). In considering these burdens, the Supreme Court commands that courts "distinguish between the evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of prison authorities." *Beard v. Banks,* 126 S. Ct. 2572, 2578 (2006). In other words, a court must "accord substantial deference to the professional judgment of prison administrators." *Overton,* 539 U.S. at 132. "Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage." *Banks,* 126 S. Ct. at 2578.

### A. <u>Willis' Challenges to the Policy</u>

Willis equivocates as to whether he makes a facial challenge to the Policy. For example, he does not challenge the facial validity of the Policy allowing the withholding of material that poses "a serious threat to the security of the facility." Rather, he challenges this regulation only to the extent that it has been interpreted to apply to the content of the Newspaper.

The Policy as written easily satisfies the *Turner* reasonableness test. As to the first *Turner* factor—whether the restriction bears a "valid, rational connection" to the "legitimate governmental interest put forward to justify it," such that the "asserted goal is [not] so remote as to render the policy arbitrary or irrational," *Turner,* 482 U.S. at 89–90—the Defendants have shown a legitimate interest in excluding from inmate possession materials which do or could pose a threat to the safety and security of the prison. Prisons are inherently dangerous places. *Brown v. Budz,* 398 F.3d 904, 909, 913 (7th Cir. 2005); *Riccardo v. Rausch,* 375 F.3d 521, 525 (7th Cir. 2004). "Guards and inmates co-exist in direct and intimate contact. Tension between them is unremitting. Frustration, resentment, and despair are commonplace. Relationships among the inmates are varied and complex . . . ." *Wolff v. McDonnell,* 418 U.S. 539, 562 (1974). The legitimate interest is precisely

dictated by the recognition that "central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." *Pell v. Procunier*, 417 U.S. 817, 823 (1974).

As to the second *Turner* factor—whether there are "alternative means of exercising the right that remain open to prison inmates"—the IDOC permits content which is not excludable under the Policy, so if Willis can locate that content he will be able to receive it. Where there are other means of exercising the asserted right, courts should be "particularly conscious of the measure of judicial deference owed to corrections officials." *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 131 (1977). Pendleton inmates are able to receive other publications containing "cutting-edge articles" and commentary that frequently pertain to civil rights, incarceration, and institutional reform. For example, Willis still has access to publications such as *Black & Pink*, a monthly newsletter that primarily contains material written by incarcerated member of the LGBTQ community and copies of *Prison Legal News*, a magazine containing articles about prison legal issues, written mostly by prison inmates. Because viable alternative means of exercising his First Amendment rights remain available to Willis, despite IDOC's restrictions, the second *Turner* factor is satisfied.

As to the third *Turner* factor—"the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"— the allocation of additional resources to implement the policy without blanket rejection of an issue of the Newspaper would drain the prison's resources and jeopardize the timely processing of incoming mail. *See Harbin-Bey v. Rutter*, 420 F.3d 571, 2005 FED App. 0354P (6th Cir. 2005) (sustaining dismissal of plaintiff's First Amendment claim based on confiscation of his magazine, For Him Magazine (FHM), because plaintiff could not support his claim that it would not be an

undue burden on officials to read each incoming periodical and excise offending portions rather than rejecting the periodical in totem. An article in the magazine contained gang symbols). Willis' proposed solution that objectionable portions of the Newspaper be cut out and the remainder given to the inmate would be unduly burdensome on prison staff.

As to the fourth and final *Turner* factor—"the absence of ready alternatives"—the only alternative proposed by Willis is additional effort by Pendleton staff. A "ready alternative" must be one that "fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests." *Thornburgh v. Abbott,* 490 U.S. 401, 418 (1989). The incremental measures Willis suggests would have more than a *de minimis* adverse effect on the legitimate penological interest in conserving prison resources. Cost and convenience routinely justify infringement on constitutional rights under *Turner*'s less stringent reasonableness standard. Conserving resources is a legitimate penological interest for purposes of the *Turner* analysis. *E.g., Freeman v. Tex. Dep't of Crim. Justice,* 369 F.3d 854, 861 (5th Cir. 2004) ("[S]taff and space limitations, as well as financial burdens, are valid penological interests."); *Schroeder v. Smythe,* 29 F.3d 634, 1994 WL 283678, at *2 (9th Cir. June 24, 1994) (unpublished decision) ("[T]he grievance restriction was based upon legitimate penological interests in preventing a drain on prison resources . . . .").

Each of the *Turner* factors favors upholding the validity of the Policy as written.

**B.     Application of the Policy**

The Court next turns to the application of the Policy to issues of the Newspaper which were withheld from Willis. These consist of the December 2015 issue and the 2016 issues from January through August, inclusive. The standard is deferential. Courts must give "substantial deference to the professional judgment of prison administrators." *Beard v. Banks,* 548 U.S. 521, 528 (2006) (citing *Overton v. Bazzetta,* 539 U.S. 126, 132 (2003)). "A court does not have to agree with the

officials' proffered legitimate penological interest. The inquiry under *Turner* is not whether the policy actually serves a penological interest, but rather whether it was rational for jail officials to believe that it would." *Covell v. Arpaio*, 662 F. Supp. 2d 1146, 1152–53 (D. Ariz. 2009) (internal citations omitted).

The "professional judgment" in the evidentiary record in this case is found at pages 32-43 of the deposition of Kurt Bensheimer ("Bensheimer"), the deputy chief of STG operations for the IDOC. ([Filing No. 26-1 at pp. 11-13](Filing No. 26-1 at pp. 11-13).) At the time his deposition was taken on September 30, 2016, Bensheimer was familiar with the issues of the Newspaper which had been withheld from Willis. He was also familiar with the Policy being challenged in this case and, in fact, is a principal administrator of the Policy. Bensheimer's deposition testimony establishes why the withheld issues of the Newspaper constituted restricted correspondence under the Policy. This testimony can be summarized as follows:

| Newspaper Issue | Rationale for Withholding from Willis |
| --- | --- |
| December 2015 | Issue contained an article written by Shaka Shakur, a Pendleton inmate and a STG member |
| January 2016 | Issued contained as advertisement with a STG and contained a pen pal solicitation by a Pendleton inmate |
| February 2016 | Issue contained an article which could inspire violence against prison guards and against other inmates based on the recent stabbing death of Hugo "Yogi" Pinell in California |
| March 2016 | Issue contained articles promoting the Black Panther Party |
| April 2016 | Issue contained articles thought to advocate disobedience and resistance to prison authorities |
| May 2016 | Issue contained article that promoted work strikes as a means of change and also contained an article referring to the KKK |
| June 2016 | Issue contained the image of a gorilla with a bleeding pig in its mouth, thought to promote violence against prison officials, and also contained an article which promoted hunger strikes and work strikes as a means of change |
| July 2016 | Issue contained an advertisement for a national prison strike in September 2016 and contained an advertisement for the Black Panther Party |
| August 2016 | Issue contained an article glorifying the Marlin Courthouse Slave Rebellion |

The reasons proffered by Bensheimer, in each instance, are rooted in the Policy and are reasonably related to the legitimate penological objective of maintaining order and security at Pendleton. To be constitutional, the decision to bar a publication must be based on a "conscientious review" of the challenged material. *See, e.g., Shakur v. Selsky*, 391 F.3d 106 (2d Cir. 2004) (holding that prison officials must justify their blanket statements that "New Afrikan political literature" contains gang signals that can be banned); *Shaheed-Muhammad v. Dipaolo,* 393 F. Supp. 2d 80, 104 (D.Mass. 2005) (holding prison officials failed to justify censorship of The Five Percenter where they failed to explain "why these particular editions of The Five Percenter posed a security risk"); *Marria v. Broaddus*, 2003 WL 21782633 (S.D.N.Y. 2003) (striking down ban on Five Percenter literature in the absence of a showing it advocated violence); *Winburn v. Bologna,* 979 F. Supp. 531 (W.D.Mich. 1997)); *Olson v. Loy*, 951 F.Supp. 225 (S.D.Ga. 1996) (refusal of prison authorities to deliver an issue of Prison Life Magazine to an inmate did not violate the First Amendment; magazine contained inflammatory information about illegal aliens and guards at the prison; court held the defendants' actions were reasonable given the potential disorder and violence that such an article could cause; thus, the defendants' motion for summary judgment was granted); *Knecht v. Collins*, 903 F. Supp. 1193 (S.D.Ohio 1995), *aff'd in part, vacated in part, rev'd in part on other grounds,* 187 F.3d 636 (6th Cir. 1999) (prison officials did not violate First Amendment where officials banned a publication which promoted hostile takeovers of prison and advocated dissension among inmates; court rejected inmate's argument that the publication was appropriate because the publication contained articles that concerned legitimate inmate issues as well); *Yoder v. Oestreich,* 820 F.Supp. 405 (W.D.Wis. 1993) (removal from a newspaper of an article advocating violence against a prison guard does not violate the Constitution because it is rationally related to security interests); *Thomas v. U.S.*

*Secretary of Defense,* 730 F. Supp. 362 (D.Kan. 1990) (wholesale rejections of publications are forbidden; individual judgments based on conscientious review are required before a political publication may be withheld). The testimony of Bensheimer shows the exercise of such nuanced review.

### III. CONCLUSION

"[I]nmates retain at least some constitutional rights despite incarceration," but those rights must be balanced against state interests in maintaining prison safety and security. *Washington v. Harper*, 494 U.S. 210, 223 (1990). This case poses the question whether there are disputed questions of fact which could support a finding that prison officials have overstepped the limits of their considerable discretion. Quite simply, it does not. The evidentiary record in this case shows that the Policy is rationally related to the legitimate purpose of preserving security and order at Pendleton. *Jordan v. Wolke,* 615 F.2d 749, 753 (7th Cir. 1980); *see Turner,* 482 U.S. at 92 ("[T]he core functions of prison administration [are] maintaining safety and internal security."). The record, likewise, shows that the application of the Policy to the issues of the Newspaper disputed here was reasonably related to a legitimate, penological interest. Nothing further is required. Willis' First Amendment rights were not violated by Defendants. Accordingly, the Defendants' Motion for Summary Judgment ([Filing No. 31](Filing No. 31)) is **GRANTED** and Willis' Motion for Summary Judgment ([Filing No. 26](Filing No. 26)) is **DENIED.**

Judgment consistent with this Entry shall now issue.

**SO ORDERED.**

Date: 6/28/2017

_____
TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Jan P. Mensz
ACLU OF INDIANA
jmensz@aclu-in.org

Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org

Jonathan Paul Nagy
OFFICE OF THE INDIANA ATTORNEY GENERAL
jonathan.nagy@atg.in.gov

Robert C. Allega
OFFICE OF THE INDIANA ATTORNEY GENERAL
robert.allega@atg.in.gov